156 F.3d 71
 33 Bankr.Ct.Dec. 198, Bankr. L. Rep. P 77,792
 SANFORD INSTITUTION FOR SAVINGS, Plaintiff, Appellant,
v.
Michael A. GALLO, Jr., Defendant, Appellee.
 No. 98-9004.
 United States Court of Appeals,
First Circuit.
 Heard June 4, 1998.
Decided Sept. 4, 1998.
 
 Thomas C. Bradley, with whom Michael K. Martin and Petruccelli & Martin were on brief, for appellant.
 James F. Molleur, with whom Woodman & Edmands, P.A. was on brief, for appellee.
 Before TORRUELLA, Chief Judge, ROSENN,* Senior Circuit Judge, and STAHL, Circuit Judge.
 ROSENN, Senior Circuit Judge.
 
 
 1
 This appeal raises an important question pertaining to the discharge in bankruptcy of a debt for property that was obtained by fraud. Title 11 U.S.C. § 523(a)(2)(A) provides that the debtor shall be denied a discharge of any debt for money or an extension of credit to the extent obtained by a false representation or actual fraud. It is undisputed that the debtor, Michael A. Gallo Jr., knowingly made false representations to the Sanford Institution for Savings ("SIS" or "the Bank") on the basis of which he obtained a standby letter of credit from it for $250,000. SIS objected to the discharge of Gallo's debt stemming from SIS's payment honoring the letter of credit. Gallo, however, contended that the United States Supreme Court construed the statute in Field v. Mans, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), as inapplicable when the victim does not justifiably rely on the debtor's fraudulent representation.
 
 
 2
 The bankruptcy court rejected the Bank's objection and ordered the debt discharged. SIS appealed to the circuit's bankruptcy appellate panel which affirmed the decision of the bankruptcy court by a two-to-one majority. In re Gallo, 216 B.R. 306 (1st Cir.BAP 1998). SIS timely appealed to the Court of Appeals. We reverse.
 
 I.
 
 3
 On June 19, 1996, Appellee Gallo filed a petition in bankruptcy pursuant to Chapter 7 of the federal bankruptcy code in the United States Bankruptcy Court for the District of Maine. See 11 U.S.C. §§ 701-66 (West 1993) (codification of Chapter 7). SIS, the appellant, is a creditor of Gallo's, having obtained a default judgment against him in state court in excess of $300,000. In the bankruptcy proceeding, pursuant to § 523(a)(2)(A), SIS filed an adversary action against Gallo seeking to have the debt declared nondischargeable on the ground that Gallo had procured by fraud a $250,000 letter of credit underlying the debt. After a bench trial, the bankruptcy court found that SIS was not justified in relying on misrepresentations Gallo made to SIS and held the debt dischargeable. In re Gallo, 208 B.R. 756 (Bkrtcy.D.Me.1997).
 
 
 4
 The important facts are not in dispute.[1] See In re Gallo, 208 B.R. at 757-58. In December 1989, Gallo, a longtime and faithful customer of SIS, requested a standby letter of credit from SIS to be issued to People's Heritage Bank, which had agreed to finance a hotel development project of Gallo's in Ogunquit, Maine. Gallo, a busy and respected real estate developer residing in Sanford, Maine, had obtained numerous loans from SIS since the 1970s, including a $150,000 unsecured line of credit. Gallo had always timely repaid each loan and maintained an exemplary record with SIS. SIS President Rodney Normand handled many, if not all, of Gallo's loans and submitted Gallo's letter of credit request to the Bank's board of directors. The board authorized the letter of credit on the condition that Gallo give SIS a second mortgage on his home (SIS already held a first mortgage), which he had owned jointly with his wife, Gail Gallo, and a second mortgage on the hotel property.
 
 
 5
 In July 1989, unknown to SIS, Gallo had transferred his interest in his home to his wife pursuant to a separation agreement. SIS was unaware of this transfer, although the mortgage required notice to it from the mortgagors in such an event. Approximately four days after requesting the letter of credit, Gallo received and executed the required documents. However, outside the presence of SIS officials, Gallo had forged his wife's signature to the underlying documents. The bank required Gail Gallo's signature because it believed that she, along with her husband, jointly owned their home and had to consent to the mortgage. It is undisputed that Gail Gallo did not know of or consent to the signing of her name to the security documents. Normand, the bank president, signed as a witness to Gail Gallo's signature even though he did not personally see her sign the documents. In sum, Gallo falsely represented to the bank that he and Gail Gallo still held an interest in the home and that she had signed the supporting documents.
 
 
 6
 SIS did not perform a title search for the Gallos' home in this instance even though the bankruptcy court found that it was the Bank's normal policy to do so with mortgage loans. SIS did not do so in this case because Normand considered Gallo to be an honest, reliable, and trustworthy customer who had a long history of scrupulously meeting his previous obligations to SIS. Besides, Gallo was in a great deal of haste in obtaining the letter of credit because of pressure in meeting the closing date on the hotel project.
 
 
 7
 The hotel development project went awry. On July 18, 1991, People's Heritage Bank presented the letter of credit to SIS and requested payment of the full amount. SIS honored its standby letter of credit to Gallo and paid People's Heritage Bank $250,000 on July 24, 1991. SIS later obtained a default judgment against Gallo in the amount of $301,594.22, including interest, attorneys' fees, and costs. The judgment has not been satisfied.[2]
 
 
 8
 Following trial, the bankruptcy court held that the debt was dischargeable notwithstanding Gallo's fraud because the Bank did not justifiably rely on his misrepresentations to it. Specifically, the court held that SIS did not justifiably rely on Gallo's two false representations, i.e., that he owned his home or that his wife had signed the loan documents. The court reasoned that "[w]hether SIS justifiably relied on the signed loan documents is dependent upon whether or not SIS had an obligation to investigate title to the property." See 208 B.R. at 759. The court held that, because SIS was a "sophisticated" lender, it was required to act in accordance with its normal policy and perform a title search before it could rely on Gallo's statement that he had an interest in the home. See 208 B.R. at 758-59. In affirming the bankruptcy court's decision, the bankruptcy appellate panel reasoned that if SIS had performed a title search, it would have discovered that Gallo no longer owned an interest in the home. This would have put the bank on notice that something was wrong and should have caused it to refuse Gallo's request for the letter of credit. See 216 B.R. at 310 n. 4
 
 II.
 
 9
 The adversary action is a core proceeding because it is an objection to the discharge of a debt. See 28 U.S.C. § 157(b)(2)(J). Thus, the bankruptcy court had subject-matter jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334(a). The bankruptcy appellate panel had appellate jurisdiction pursuant to 28 U.S.C. § 158(b)(1). This Court has appellate jurisdiction pursuant to 28 U.S.C. §§ 158(d) and 1291.
 
 III.
 
 10
 This case presents a sole legal issue: namely, whether the bankruptcy court properly applied to the facts the "justifiable reliance" element of the fraud interpretation announced by the Court in Field v. Mans, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Thus, this Court exercises plenary review. See Monarch Life Ins. Co. v. Ropes & Gray, 65 F.3d 973, 978 (1st Cir.1995).
 
 
 11
 Title 11 U.S.C. § 523(a)(2)(A) bars from discharge in bankruptcy a debt for money, property, services, or an extension, renewal, or refinancing of credit, obtained by false pretenses, a false representation, or actual fraud.[3] In Field v. Mans, the Supreme Court construed this provision to require the creditor to prove that its reliance on the misrepresentation was justified in order to avoid discharge. 516 U.S. at 61, 116 S.Ct. 437; accord Palmacci v. Umpierrez, 121 F.3d 781, 786 n. 3 (1st Cir.1997); Matter of Bero, 110 F.3d 462, 465 (7th Cir.1997); In re Bilzerian, 100 F.3d 886, 892 (11th Cir.1996), cert. denied, --- U.S. ----, 118 S.Ct. 1559, 140 L.Ed.2d 791 (1998); In re Apte, 96 F.3d 1319, 1322 (9th Cir.1996). The Court rejected the argument that the more demanding "reasonable reliance" standard applied. See id. at 70, 116 S.Ct. 437 (citing and adopting Restatement (Second) of Torts § 545A, cmt. b, which states that plaintiff's conduct does not have to conform to "reasonable man standard").
 
 
 12
 The Court adopted the dominant common-law formulation of the elements of fraudulent misrepresentation as set forth in the Restatement (Second) of Torts §§ 537-45 and Prosser and Keeton on Torts § 108, at 750-52.[4] In contrast to the reasonable reliance standard, in order to show justifiable reliance, the creditor need not prove that he acted consistent with ordinary prudence and care. " 'The design of the law is to protect the weak and credulous from the wiles and stratagems of the artful and cunning, as well as those whose vigilance and security enable them to protect themselves' and 'no rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' " Prosser § 108, at 751 (citations omitted).
 
 
 13
 The rationale for placing this relatively low burden on the victim of the misrepresentation is rooted in the common law rule that the victim's contributory negligence is not a defense to an intentional tort. See Restatement (Second) of Torts § 545A & cmt. a; Prosser § 108, at 750; accord Apte, 96 F.3d at 1323. In such circumstances, the equities weigh in favor of giving the benefit of the doubt to the victim, careless as it may have been, and even though it could have been more diligent and conducted an investigation. This rationale was most clearly stated by Lord Chelmsford in Directors of the Central R. Co. of Venezuela v. Kisch, 2 H.L. 99, 120 (1867):
 
 
 14
 But it appears to me that when once it is established that there has been any fraudulent mis-representation or wilfull concealment by which a person has been induced to enter into a contract, it is no answer to this claim to be relieved from it to tell him that he might have known the truth by proper inquiry. He has a right to retort upon his objector, "You, at least, who have stated what is untrue, or have concealed the truth, for the purpose of drawing me into a contract, cannot accuse me of want of caution because I relied implicitly on your fairness and honesty."
 
 
 15
 A party may justifiably rely on a misrepresentation even when he could have ascertained its falsity by conducting an investigation. See Restatement (Second) of Torts §§ 540, 541 cmt. a (1976); Prosser § 108, at 753; see also Field, 516 U.S. at 70, 116 S.Ct. 437. This rule applies whether the investigation would have been costly and required extensive effort or could have been made without "any considerable trouble or expense." Restatement § 540 cmt. a; Prosser § 108, at 753. This pragmatic rule of conduct is at the heart of millions of commercial transactions conducted daily in this nation which rely on the honesty and truthfulness of representation made by the parties. For example, it is common knowledge that the stock exchanges of this nation depend upon and are fueled by representations of the parties which are conducted without preliminary investigations. However, the reliance on misrepresentations known by the victim to be false or obviously false is not justified; falsity which could have been discovered by senses during a cursory glance may not be relied upon. Restatement § 540 cmt. a; see also id. § 541 & cmt.; accord Prosser § 108, at 750, 751.
 
 
 16
 The illustration following Restatement § 540 is particularly instructive in this case:
 
 
 17
 A, seeking to sell land to B, tells B that the land is free from all incumberances. By walking across the street to the office of the register of deeds in the courthouse, B could easily learn that there is a recorded and unsatisfied mortgage on the land. B does not do so and buys the land in reliance upon A's misrepresentation. His reliance is justified.
 
 
 18
 Gallo reiterates the statement of the bankruptcy court that SIS could not justifiably rely on his statements because it could have conducted a routine title search and discovered that he no longer owned the home he had pledged as security for the loan.[5] The bankruptcy court equated a title search by a financial institution with the "cursory investigation" referred to in Restatement § 541, cmt a. Gallo contends that the "qualities" and "characteristics" SIS possessed as a sophisticated financial institution required it to suspect that Gallo was attempting to commit fraud. See Restatement § 545A cmt. b.
 
 
 19
 We disagree. We conclude that the bankruptcy court and bankruptcy appellate panel misapplied the justifiable reliance standard. In light of Gallo's extensive and trustworthy relationship with SIS and representation that he owned an interest in the home and that his wife had agreed to the mortgage, SIS was not required to take the investigative step of obtaining a title search to confirm those statements. See Restatement § 540, illus. 1. The law is clear that SIS was entitled to rely on the statements unless there were warning signs of their falsity, even if obtaining a title search was easy and a matter of bank policy. Restatement § 540, cmt. a. In the absence of any warning signs (i.e., obvious or known falsities, see Restatement § 541) either in the documents, in the nature of the transaction, or in Gallo's conduct or statements, the Bank justifiably relied on his representation. Its qualities and characteristics as a sophisticated lender did not require it to do a title search when presented with a transaction that, on its face, appeared free of fraud. This was not the case here. Gallo specifically represented to SIS that he owned the home with his wife and that his wife had agreed to the mortgage and signed the documents. Those statements were consistent with the documents and his conduct.
 
 
 20
 The illustration in the Restatement § 540 quoted above, which was cited with approval by the Supreme Court, could not be more on point. In the example, a buyer of real property relies on the seller's representation that the property is unencumbered by liens. The buyer could have investigated the claim and determined its falsity by walking "across the street" and examining readily available public records. According to the Restatement, the failure to conduct this simple and easily undertaken investigation would not preclude a cause of action by the buyer against the seller because reviewing even these easily obtained records is an investigation and an investigation is not required when the misrepresentation is intentional. See Restatement § 540 illus. 1. The illustration replicates the facts of this case almost completely.
 
 
 21
 Additionally, SIS had numerous other reasons to rely on Gallo's statements aside from the regularity of the security documents. Prior to this incident, Gallo was reputed to be an honest, trustworthy, and reliable businessman in the community and was a long-time SIS customer who always paid off his previous loans with the Bank. He had a strong business and somewhat personal relationship with Normand. Further, Gallo's representations that he owned the home he pledged as security and that his wife had signed the loan documents were not implausible or obviously false, especially in light of his previous mortgage. Certainly, the representations of a long-time customer with a reputation for honesty and trustworthiness and an excellent track record of consistent loan repayments was a basis on which to justify reliance.
 
 
 22
 The exercise of reasonable care would have required a title search to determine whether Gallo still actually owned the property he pledged as collateral. SIS was likely negligent for failing to do so. Nonetheless, its lack of care does not exculpate Gallo's fraud and dishonesty. The court should not reward him for his fraud because the Bank should have been more circumspect. SIS's negligence does not relieve Gallo of continued responsibility for his intentional tort. See Apte, 96 F.3d at 1323; Restatement § 545A. The Supreme Court, the Restatement, and Prosser on Torts are unmistakably clear that SIS was not required to make an investigation and that it justifiably relied on Gallo's statements.
 
 IV.
 
 23
 For those reasons, we will reverse the bankruptcy appellate panel and remand with instructions to vacate the bankruptcy court decision and direct the bankruptcy court to enter judgment for SIS barring the debt from discharge.
 
 
 24
 STAHL, Circuit Judge, dissenting.
 
 
 25
 Unlike the majority, I would leave intact the ruling of the bankruptcy court, affirmed by the bankruptcy appellate panel, that SIS, acting through Roger Normand, did not justifiably rely upon Gallo's false affixation of his then-wife's signature to the loan documents.[6] But even if I could agree that Normand's putative reliance was justifiable, I would vacate and remand for fact-finding on an issue the lower courts did not reach: whether Normand relied in fact upon the forged signature. For both these reasons, I dissent from the majority's reversal of the lower court's judgment.
 
 I.
 
 26
 As an initial matter, I disagree with the majority's statement that "[t]his case presents a sole legal issue ... [over which] this Court exercises plenary review." Ante at 74. So long as there is no indication that the lower courts misapprehended the relevant legal principles (and my review of their opinions reveals that they were fully aware of the applicable justifiable reliance standard, as explicated by the Supreme Court in Field v. Mans, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)), a finding that Normand's reliance, if any, was unjustified is a paradigmatic fact-dominated mixed fact/law determination that we should accept unless shown to be clearly erroneous. See In re Extradition of Howard, 996 F.2d 1320, 1328 (1st Cir.1993) (explaining this circuit's sliding scale approach to mixed fact/law determinations); see also In re Apte, 96 F.3d 1319, 1324 (9th Cir.1996) (reviewing for clear error a no-justifiable-reliance determination made in a bankruptcy court proceeding); cf., e.g., Henry v. Connolly, 910 F.2d 1000, 1003 (1st Cir.1990) (reviewing for clear error determination of no-reasonable-reliance made on a misrepresentation claim brought under Massachusetts law); Piekarski v. Home Owners Sav. Bank, F.S.B., 956 F.2d 1484, 1493 (8th Cir.1992) (reviewing for clear error determination of justifiable reliance made on a misrepresentation claim brought under Minnesota law); Offshore Prod. Contractors, Inc. v. Republic Underwriters Ins. Co., 910 F.2d 224, 232 (5th Cir.1990) (reviewing for clear error determination of justifiable reliance made on a misrepresentation claim brought under Louisiana law). Thus, we are empowered to reverse only if, on our review of the record as a whole, we have a "definite and firm conviction that a mistake has been made." Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (citation and internal quotation marks omitted).
 
 
 27
 Perhaps because I see the standard-of-review question differently than the majority, I also am at a loss to understand its appellant-friendly recitation of the facts relevant to the question we must answer. Because the trial court, following a bench trial, pretermitted the question of reliance in fact but agreed with Gallo that any reliance by SIS was unjustifiable, we are obliged to view the facts in the light most flattering to its conclusion. See La Esperanza De P.R. v. Perez Y Cia. De Puerto Rico, Inc., 124 F.3d 10, 12 (1st Cir.1997). So viewed, the facts on which we should base our judgment are as follows.
 
 
 28
 In his trial testimony, Normand admitted that, although he telephoned Gallo on the afternoon of Wednesday, December 20, 1989, to inform Gallo that the Board had approved the request for the letter of credit, he did not inform Gallo of the requirement of a second mortgage on the Sanford home until the morning of Friday, December 22, 1989, when Gallo arrived in his office to sign the loan documents. Normand did not explain why he chose to wait until Friday to inform Gallo of the Board's unanticipated (by Normand and Gallo) condition on the letter of credit. Nor did Normand explain his failure to ask Gallo and his wife to come in to sign the documents, even though Normand thought at the time that Gallo and his wife were co-owners of the Sanford home.
 
 
 29
 Normand further testified that, when he informed Gallo that SIS's Board of Directors would require a second mortgage on the Sanford home in order to issue the requested letter of credit, Gallo told him that his wife "did not want or did not like a second mortgage on the property and that he [sic] would object to having it." Despite this signal that Gallo's wife would object to the Board's condition, Normand permitted Gallo to take the documents from his office with the following promise: "I will get her to sign." And later that same day, Normand uncritically accepted back from Gallo the loan documents with what purported to be Gallo's wife's unwitnessed signature. Normand then signed his own name to the blank witness line without so much as a telephone call to Gallo's wife to confirm that she had indeed assented to the mortgage. Finally, despite the fact that the letter of credit constituted what Normand described as "a very heavy loan for us," Normand thereafter declined to follow customary SIS practice and do a title search on the property--a search that would have informed SIS that Gallo was misrepresenting that he had an interest in the property and surely would have caused SIS to question Gallo's wife about whether she had, in fact, assented to the mortgage.
 
 
 30
 In view of this evidence, I cannot say with a definite and firm conviction that the trial court erred in concluding that Normand proceeded in the face of what amounted to a warning that a deception was underway. And as the Supreme Court acknowledged while explaining the justifiable reliance standard, such a warning puts to its recipient a duty to investigate (at least cursorily) before there may be justifiable reliance upon the misrepresentation. See Field, 516 U.S. at 71, 116 S.Ct. 437 (citing W. Prosser, Law of Torts § 108, at 718 (4th ed.1971)).
 
 
 31
 Yet Normand failed to undertake either of the cursory investigative routes obviously available to him at the time of Gallo's highly irregular document submission; he neither telephoned Gallo's wife to confirm her signature before witnessing it, nor searched the title of the property in question. In my opinion, Normand's inaction constituted a breach of the duty to investigate. The trial court therefore did not err in concluding that Normand (and, derivatively, SIS) assumed the risk arising from Gallo's conduct. See Restatement (Second) of Torts § 545A, Cmt. b. (1976) (when the recipient of a misrepresentation proceeds in the face of facts making obvious the falsity of the representation, "his conduct is more analogous to assumption of the risk than to contributory negligence").
 
 II.
 
 32
 Even if I agreed with the majority that Normand's putative reliance on Gallo's wife's signature was justifiable as a matter of law, I would remand for further fact-finding as to whether Normand relied in fact upon the signature. Cf. Field, 516 U.S. at 76, 116 S.Ct. 437 (noting that "the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact"). Because the bankruptcy court deemed any reliance in fact unjustifiable, it did not decide whether there was such reliance. Yet the facts just outlined suggest, to say the least, that Normand did not view the second mortgage as necessary. Moreover, I believe it worthwhile to emphasize one additional point not mentioned by the majority: although the other second mortgage required for the letter of credit--the second mortgage on the development--was recorded in due course, the mortgage on the Sanford home was not recorded until 1991, nearly two years after the letter of credit issued and a mere one week after another creditor recorded a $1.2 million lien against Gallo. I regard this lapse, which Normand was unable to explain at trial, as especially curious because it was the mortgage on the Sanford home on which the Board had insisted (apparently over Normand's disagreement).[7] One can only assume that the Board insisted on the second mortgage on the home because it viewed the second mortgage on the development as insufficient to protect its interests in the event of a default and a calling of the letter of credit.
 
 III.
 
 33
 Had the facts described above been adduced in a criminal bank fraud trial, they surely would have been sufficient to justify the giving of a willful blindness instruction. These same facts thus should be regarded as adequate to ground the trial court's determination that Normand did not justifiably rely on Gallo's forgery because Normand effectively ignored a warning that Gallo had forged his wife's signature to the loan documents. Alternatively, these facts should be regarded as sufficient to warrant a remand for inquiry into whether Normand relied in fact on Gallo's forgery.
 
 
 34
 I dissent.
 
 
 
 *
 Of the Third Circuit, sitting by designation
 
 
 [1]
 SIS claims that the bankruptcy court committed clear error in making two factual findings that it was SIS's "policy" to conduct title searches any time it made a loan secured by real property and that SIS knew that the Gallo was divorced from his wife at the time the loan was made. Because these factual findings are not dispositive of this appeal, we do not discuss them
 
 
 [2]
 The dissent claims that we have recited the facts in an improperly "appellant-friendly" manner. Dissent op. at 77. We have not done so, but, as one can see, have recited the essential facts almost precisely the way the bankruptcy court found them. See 208 B.R. at 757-58. The only part of the "Findings of Fact" section of the bankruptcy court's opinion we do not include in our opinion are not findings of fact. In that part, the court noted the conflict between Normand's and Gallo's testimony on the issue of whether the Bank knew that Gallo was divorced from his wife and whether Gallo was aware that the Bank would require a second mortgage on the home. Id. at 758. The bankruptcy court did not resolve the conflict in this testimony. See 208 B.R. at 759 n. 5 (stating that it would not resolve the conflict in testimony regarding Gallo's knowledge of the requirement of the second mortgage on the home because "it is irrelevant for purposes of this decision")
 
 
 [3]
 Section 523(a)(2)(A) provides: "A discharge ... does not discharge an individual debtor from any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation of actual fraud...."
 
 
 [4]
 The Court characterized the justifiable reliance standard as "dominant" because 36 states have adopted it and both the Restatement and Prosser and Keeton have recognized it as the majority rule
 
 
 [5]
 The dissent claims that the circumstances of the transaction "amounted to a warning that a deception was underway." Dissent op. at 77. According to the dissent, this "warning" required the bank to conduct an investigation. This claim misses the point. The bankruptcy court did not find that any warning existed. Rather, the bankruptcy court concluded that the bank, as a "sophisticated lender" had "an obligation to conduct the most cursory of investigations, i.e., a title search." 208 B.R. at 759. According to the bankruptcy court, the "cursory investigation" of the title search was required regardless of the nature of the transaction; contrary to the dissent's claim, the title search--not the transaction itself--would have disclosed a warning. See id. ("[b]y failing to follow its own practice, SIS assumed the risk that its security would be worthless")
 
 
 [6]
 I limit my focus to Gallo's forgery of his wife's signature because my conclusions with respect to this forgery render immaterial whether Normand, and therefore SIS, justifiably relied upon Gallo's concomitant representation that he had an interest in the Sanford home
 
 
 [7]
 People's Heritage Bank, the financer of the development, held a first mortgage on the development, but SIS held the first mortgage on the Sanford home