## In re Joseph O'BRIEN, Debtor.

## Auto Glass Wholesale, Inc., Plaintiff,

## v.

## Joseph Farrell O'Brien, Defendant.

### Bankruptcy No. 98–12520.
### Adversary No. 98–1125.

United States Bankruptcy Court, D. Rhode Island.

March 8, 2000.

---

Patricia Antonelli, Timothy J. Robenhymer, Partridge Snow & Hahn LLP., Providence, RI, for Plaintiff.

Andrew S. Richardson, Boyajian, Harrington & Richardson, Providence, RI, for Debtor/Defendant.

### *OPINION AND ORDER*

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Heard on the Complaint of Auto Glass Wholesale, Inc. ("AGW") to determine the dischargeablity of its debt, under 11 U.S.C. § 523(a)(2)(A). The main issue is the determination of a factual dispute, involving the credibility of the witnesses. AGW alleges that it extended credit to Joseph O'Brien in reliance on a personal guaranty purportedly executed by his wife, Mary O'Brien. The Debtor admits that Mary's name was executed by him without her knowledge or permission, but contends that AGW knew all along that the signature was not genuine. For the reasons discussed below, we conclude: (1) that the debt to AGW is nondischargeable under 11 U.S.C. § 523(a)(2)(A); and (2) that, based upon our findings and conclusions herein, AGW is entitled as a matter of law to damages under Mass. Gen. Laws ch. 93A § 11.

### *FACTS* [1]

AGW is in the business of selling glass to various automobile repair shops in the region. At all relevant times Joseph O'Brien was the principal of O'Brien Enterprises, Inc., and his wife, Mary C. O'Brien, was an officer of the corporation.

Beginning sometime in 1995 or 1996, O'Brien Enterprises, Inc. did business under the names: Providence Glass Center, and The Glass Center, operating businesses as auto glass repair facilities. Each entity purchased approximately 50% of its glass from AGW.

Initially, credit with AGW was cash on delivery, but before long AGW was shipping merchandise at net 30 days with a

---

1. This opinion constitutes our findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052 and 9014.

credit limit of $10,000. Although O'Brien had a history with AGW of being a slow payer, he was nonetheless considered a good steady customer, who paid his bills eventually. Things changed in the summer of 1997 when O'Brien landed two large accounts—an auto dealership and a car rental company. Probably because they insisted upon it, O'Brien provided these new customers with sixty days to pay their bills, thirty days longer than he had from AGW. The inevitable consequences of this arrangement appeared right on schedule, and within weeks O'Brien owed AGW $45,000 which was over 30 days past due.

Reacting quickly, in early September AGW asked O'Brien to meet with three of its representatives: Tom Brown, sales representative; Jeremiah Carey, the General Manager of AGW; and Robert J. D'Orval, the Vice President of AGW, all of whom had expressed their concern over the growing debt to AGW, and the increased volume O'Brien was experiencing on account of the new business. At the meeting AGW did not soften its credit terms with O'Brien, but in fact admonished him to "get within thirty days." In addition, after the meeting Robert D'Orval instructed the credit manager, Karen Walker, to obtain personal guarantees from Mr. and Mrs. O'Brien. Although AGW already had a personal guaranty from Mr. O'Brien regarding the debts of The Glass Center, it was now requesting guarantees for both companies, plus Mrs. O'Brien's personal guaranty as an officer of the corporation, because she represented a separate, additional source of income.[2]

In this regard Walker telephoned O'Brien and informed him that without personal guarantees from both him and his wife, AGW would not continue to ship on credit. O'Brien stated that he had no problem with this, but requested to see a copy of the document first. Walker had AGW's attorney, Stephen L. Kornstein, draft the guaranty and she sent a copy to O'Brien. At the same time a meeting was scheduled for October 3, 1997, at AGW's Randolph, Massachusetts, facility for the purpose of executing the guarantees. From this point forward, the parties present the Court with two diametrically opposed scenarios as to what transpired regarding the execution of the guaranty.

AGW contends, through the testimony of Karen Walker, that O'Brien asked AGW to send him the original of the guaranty for his wife to execute, because she would be away on a flight during the October 3 meeting. Walker, concerned about sending the original document to O'Brien, telephoned Attorney Kornstein who told her to send the document to O'Brien, with instructions to have his wife sign the guaranty in his presence. Approximately four days before the October 3 meeting, Walker sent the original document to Joseph in a delivery pouch regularly used by AGW to deliver correspondence to its wholesale glass customers. The next time Walker saw the document in question was at the October 3, 1997 meeting, which she attended with Robert D'Orval. Also present were Jeremiah Carey and Joseph O'Brien. When Walker arrived, Joseph O'Brien was already there and had a document, rolled up, in his hand. In the conference room, Walker states that she sat approximately 2 feet away from Joe and that when he put the document on the table she could see that it was the original personal guaranty. Walker states that she saw Mary O'Brien's signature already on the document. In direct and on cross examination she testified unequivocally that O'Brien did not sign Mary's name during the meeting, and that there was no discussion about Mary's signature because, as expected, it was already on the document in accordance with everyone's expectations, based on her prior conversations with Joe.

Jeremiah Carey and Robert D'Orval corroborated Walker's testimony. Carey stated that he saw Joseph O'Brien enter the Randolph facility on October 3, 1997, carrying a paper in his hand, and that he

---

2. Mrs. O'Brien is a flight attendant for a major airline.

could see this from his glass enclosed office at the entranceway to the building. He also stated that he was present when the meeting started, that the Debtor put the document on the conference table, and signed his name only. Thereafter, Robert D'Orval asked him (Carey) to witness Joseph O'Brien's signature, which he did. Carey states that when he signed his name, Mary O'Brien's signature was already affixed to the document. D'Orval, who echoed the testimony of Carey, stated that he saw the Debtor lay the document on the table at the beginning of the meeting and that after O'Brien signed his own name, D'Orval signed as a witness. Mr. D'Orval testified that Mary's signature was already on the document, at the beginning of the meeting.

In direct contradiction of the testimony of the AGW witnesses, Joseph O'Brien testified that he never asked Karen Walker to send him the original guaranty. Instead, he says that he telephoned Walker the morning of the meeting to inform her that his wife could not attend the meeting, and that Walker told him that he still needed to be at the meeting because "it was important to Bobby for him to sign the paper." O'Brien's version is that he arrived at the Randolph facility without any documents, and after a few minutes of casual conversation they all went into the conference room where Walker handed him the original guaranty. He said he first signed his name and then "slid the document over to Bobby." After signing his name, D'Orval gave the document back to O'Brien and, according to O'Brien, Walker said that they needed his wife's signature "to make it legal." O'Brien testified that he signed his wife's name to the personal guaranty in the presence of Walker, D'Orval, and Carey, and gave the document to Carey, who then signed as a witness. O'Brien said that he signed his wife's name differently than his own, so that the signature would be legible. O'Brien also said that Walker, referring to Mrs. O'Brien's signature, made a joke about forgery.

Subsequent to the meeting, AGW continued to do business with O'Brien, although no specific payment terms were discussed by the parties on the past due debt. The default condition did not improve, and in December 1997 AGW began to pursue the O'Briens on their personal guaranties. On December 17, 1997, Attorney Kornstein, on behalf of AGW, sent the O'Briens a demand letter seeking immediate payment of $107,878, pursuant to their personal guaranties. Mary was at home alone when the letter arrived, and this was the first knowledge she had that her name appeared on a personal guaranty to AGW.

It is stipulated that subsequent to the personal guaranty, AGW shipped $54,878.25 worth of merchandise to O'Brien for which it was not paid. AGW seeks a determination that its claim in the amount of $54,878.25 be determined nondischargeable, under 11 U.S.C. § 523(a)(2)(A).

### DISCUSSION

Section 523(a)(2)(A) exempts from discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A).

In construing Section 523(a)(2)(A), courts follow the general common law of torts. *See Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir.1997), where the First Circuit Court of Appeals stated:

Under the traditional common law rule, a defendant will be liable if (1) he makes a false representation, (2) he does so with fraudulent intent, i.e., with "scienter," (3) he intends to induce the plaintiff to rely on the misrepresentation, and (4) the misrepresentation does induce reliance, (5) which is justifiable, and (6) which causes damage (pecuniary loss).

*Id.* In discussing what constitutes a false representation, the court went on to say:

The test may be stated as follows. If, at the time he made his promise, the debtor did not intend to perform, then he has made a false representation (false as to his intent) and the debt that arose as

a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met). If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.

*Id.* at 787.

Without difficulty, we find that Joseph O'Brien did not testify truthfully as to what transpired at the October 3, 1997 meeting, and particularly as to the manner in which his wife's signature became affixed to the guaranty, and his version of the facts is rejected. Put another way, the testimony of Walker, D'Orval and Carey is credible, and their description of the meeting is adopted and incorporated within and as part of our findings of fact. Plain logic supports this conclusion, i.e., Joseph O'Brien knew that AGW would stop selling glass to him unless both he and his wife signed the personal guaranty, money was tight and he definitely was not anxious to bring up with his wife the subject of her giving a personal guaranty. It was clear from both O'Briens that money problems were the source of many heated arguments, and Mary O'Brien testified that if asked to give her personal guaranty in October 1997, she would have been "very, very hesitant" to sign, based on their existing financial circumstances.

There is no doubt that Mr. O'Brien felt that he would not have been able to obtain his wife's personal guaranty, and that without it AGW would not supply the glass he needed for his business.[3] Because of his predicament, O'Brien devised a scheme to get his wife's name on the personal guaranty while neither arousing AGW's suspicion, nor re-igniting his wife's ire over their financial problems. Mary O'Brien

testified that she recalled her husband asking her about her schedule for October 3, 1997, that she informed him that she would be on a flight until late that afternoon, and that Joe never disclosed to her that AGW was seeking her personal guaranty. O'Brien then telephoned Walker to inform her that his wife would not be available for the October 3, 1997 meeting, asked her to send the original document to him, and that he would have his wife execute it prior to the meeting. With the original document in hand, O'Brien signed his wife's signature without her knowledge or consent, and altered the handwriting to make the signature appear genuine. Even after the meeting on October 3, 1997, O'Brien did not inform his wife that he had signed her name on a personal guaranty, and she did not learn of that fact until December 1997, when she opened and read the collection letter from Attorney Kornstein. Immediately, Mrs. O'Brien telephoned her husband to find out what was going on, and he "acted as if she did not know what she was talking about." Even when confronted with the truth, O'Brien continued in his deception.[4]

 The Defendant argues that AGW has failed to prove that it justifiably relied on O'Brien's misrepresentation, but this is not even a close call under the standard set by the Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), and as applied by the First Circuit Court of Appeals in *Sanford Institution for Sav. v. Gallo*, 156 F.3d 71 (1st Cir.1998). In *Field v. Mans*, the Court rejected the more demanding *reasonable reliance* standard, in favor of one requiring a creditor to prove that its reliance on the misrepresentation was *justifi-*

---

**3.** In fact, the Guaranty stated:
 The undersigned acknowledge that the within Guaranty has been voluntarily executed by each of them for the purpose of inducing Auto Glass Wholesale, Inc. to continue transacting business with O'Brien Enterprises and/or to induce Auto Glass Wholesale, Inc. to grant other financial accommodation to O'Brien Enterprises,

which financial accommodations would not have been granted had the undersigned not executed this Personal Guaranty.
 Exhibit B, Personal Guaranty.

**4.** At the same time that these many credibility issues are resolved against Joseph O'Brien, we commend Mrs. O'Brien for the straightforward manner in which she testified.

*able,* in order to avoid discharge of a debt under 11 U.S.C. § 523(a)(2)(A). 516 U.S. at 71–74, 116 S.Ct. 437. In defining justifiable reliance, the Court quoted extensively from the Restatement (Second) of Torts:

"Although the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than to the application of a community standard of conduct to all cases."

*Id.* at 70–71, 116 S.Ct. 437 (*quoting* Restatement (Second) of Torts, § 545A, Comment b (1976)).

■■■■ The First Circuit in *Gallo* reversed the bankruptcy court's finding that a creditor failed to justifiably rely on a debtor's misrepresentation, stating:

A party may justifiably rely on a misrepresentation even when he could have ascertained its falsity by conducting an investigation. . . . This rule applies whether the investigation would have been costly and required extensive effort or could have been made without "any considerable trouble or expense." . . . However, the reliance on misrepresentations known by the victim to be false or obviously false is not justified; falsity which could have been discovered by senses during a cursory glance may not be relied upon.

*Gallo,* 156 F.3d at 74–75 (*quoting* Restatement (Second) of Torts § 540 cmt. a (1976)) (other citations omitted).

From the Plaintiff's standpoint, the facts in the instant case are much stronger[5] than those in *Gallo.* In *Gallo,* the debtor, a longtime customer of the bank who always repaid his loans in a timely manner, requested the bank to issue a $250,000 standby letter of credit to secure financing on a new hotel development. 156 F.3d at 72. The bank agreed, on the condition that the debtor give a second mortgage on

both his home and on the proposed development. *Id.* Unbeknownst to the bank, the Debtor had already transferred his interest in the house to his wife as part of a separation agreement, when he forged her signature on the second mortgage. *Id.* at 73. Departing from its standard practice, and relying on the mortgage, the bank did not perform a title search on the debtor's residence. *Id.* When the development experienced financial difficulties, the Debtor filed for bankruptcy and the bank sought to exempt its claim from discharge under Section 523(a)(2)(A). *Id.* The First Circuit Court of Appeals found that because the debtor had an extensive and trustworthy relationship with the bank, the bank was not required to take the investigative step of conducting a title search. *Id.* at 75–76. Because there were no warning signs in the documents, the nature of the transactions, or in the debtor's conduct or statements, the bank was found to have justifiably relied on the debtor's misrepresentations. *Id.*

Like the bank in *Gallo,* AGW had an ongoing relationship with Mr. O'Brien who had always paid his bills to AGW, albeit a little late. O'Brien was friendly with AGW employees, to the extent that he accompanied AGW's sales representative, Tom Brown, on social outings on Brown's boat. AGW, which considered O'Brien a good customer and had no reason to distrust or disbelieve him, justifiably relied on O'Brien's representation that his wife's signature on the personal guaranty was genuine, *see Gallo,* 156 F.3d at 75, in the absence of warning signs that the representations were false. For these reasons, we conclude that the debt to AGW in the amount of $54,878.25 is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

■■■■ AGW also requests that it be awarded treble damages and attorney's fees pursuant to Mass. Gen. Laws ch. 93A §§ 2 and 11, and that we determine that

---

**5.** We have seldom seen a creditor behave as diligently as AGW vis-a-vis an extension of credit, i.e., the careful, non-boilerplate language in the guaranty, the special meeting, the involvement of its attorney, and high level company officials, etc.

award to be nondischargeable as well. Chapter 93A, makes unlawful any "[u]nfair ... acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A § 2(a). The Court's initial reaction to this claim was that Massachusetts Chapter 93A was designed to protect only consumers from unfair acts or practices, and that it would not apply to commercial transactions. Upon closer examination of the statute however, we now know that this prohibition is "extended to those engaged in trade or commerce in business transactions with others similarly engaged" by Chapter 93A, § 11. *Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 489 N.E.2d 185, 197 (1986), *citing Manning v. Zuckerman*, 388 Mass. 8, 444 N.E.2d 1262, 1264–65 (1983). Under Chapter 93A, § 11, AGW is entitled to multiple (at least double and not more than treble) damages, if O'Brien acted "knowingly" or "wilfully" in violation of § 2.[6] "A judge need not make an express finding that a person wilfully or knowingly violated G.L. c. 93A, § 2, as long as the evidence warrants a finding of either." *Service Publications, Inc. v. Goverman*, 396 Mass. 567, 487 N.E.2d 520, 527 n. 13 (1986).

▪ Here, we have already found and concluded that the Defendant intentionally forged his wife's name on a personal guaranty, in order to induce AGW to continue supplying auto glass on credit, in circumstances where no extension of credit would have been possible without the requested signature, and the Plaintiff's burden under Chapter 93A is less than what is required under Section 523(a)(2)(A). "An 'unfair or deceptive act or practice' may be established without proof that the defendant knew his or her false representation to be false and without proof that the

plaintiff relied on the representation." *Sack v. Friedlander (In re Friedlander)*, 170 B.R. 472, 479 (Bankr.D.Mass.1994) (*citing Commonwealth of Massachusetts v. Hale*, 618 F.2d 143, at 146–147 (1st Cir. 1980)). "Actions involving fraudulent representations in knowing disregard of the truth encompass culpable, 'willful' behavior under the statute". *Datacomm Interface*, 489 N.E.2d at 197. Therefore, having established that its debt is nondischargeable under § 523(a)(2)(A), AGW has ipso facto established that O'Brien acted wilfully or knowingly under Mass. Gen. Laws ch. 93A § 2. Accordingly, double damages and attorney's fees appear to be mandatory here. *See* Mass. Gen. Laws ch. 93A § 11.

▪ Finally, because an award of double damages and attorney's fees under Chapter 93A is punitive in nature, one might argue that they should be discharged. However the United States Supreme Court has recently addressed this issue, stating:

> In short, the text of § 523(a)(2)(A), the meaning of parallel provisions in the statute, the historical pedigree of the fraud exception, and the general policy underlying the exceptions to discharge all support our conclusion that "any debt ... for money, property, services, or ... credit, to the extent obtained by" fraud encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor.

*Cohen v. De La Cruz*, 523 U.S. 213, 223, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). For the reasons discussed above, the award of double damages and attorney's fees[7] is also determined to be nondischargeable.

---

**6.** By its terms, the statute mandates at least double damage if the court finds a knowing or wilful violation. The statute provides:

If the court finds for the petitioner, *recovery shall be* in the amount of actual damages; or up to three, *but not less than two,* times such amount if the court finds that the use or employment of the method of competi-

tion or the act or practice was a willful or knowing violation of said section two.
Mass. Gen. Laws ch. 93A § 11.

**7.** AGW should submit to the Defendant an itemized bill for its legal services herein. If the parties cannot agree as to the reasonableness of the bill, a hearing will be scheduled.

Enter judgment consistent with this opinion.