**In the Matter of Frank E. MOORE, a/k/a Moore's Trucking, Frank E. Moore Construction Company, Debtor.**

**D. Trent Ozburn, in his capacity as the Administrator of the Estate of Harold H. Ozburn, Plaintiff,**

v.

**Frank E. Moore, Defendant.**

**Bankruptcy No. 00–30917 RFH. Adversary No. 00–3033.**

United States Bankruptcy Court, M.D. Georgia, Athens Division.

April 16, 2002.

Leon S. Jones, Atlanta, GA, for Plaintiff.

Lynne Perkins–Brown, Madison, GA, for Defendant.

## MEMORANDUM OPINION

ROBERT F. HERSHNER, Jr., Chief Judge.

Harold H. Ozburn, Plaintiff, filed on September 13, 2000, a Complaint to Determine Dischargeability of Debt. Frank E. Moore, Defendant, filed a response on October 12, 2000. Defendant filed an amended response on January 8, 2001. The Court entered an order on November 29, 2001, substituting D. Trent Ozburn, in his capacity as the Administrator of the Estate of Harold H. Ozburn, as the plaintiff in this adversary proceeding.[1]

Plaintiff's complaint came on for trial on December 13, 2001. The Court, having considered the evidence presented and the arguments of counsel, now publishes this memorandum opinion.

## FINDINGS OF FACT

Plaintiff was a farmer in Newton County, Georgia. Plaintiff occasionally worked as a carpenter. Plaintiff had an eighth grade education. Plaintiff did business "on a handshake."

---

1. D. Trent Ozburn is the son of Harold H. Ozburn. Harold H. Ozburn died during the pendency of this adversary proceeding. The Court will refer to Harold H. Ozburn as Plaintiff in this memorandum opinion.

Defendant moved to Newton County in 1965. Defendant resided about a mile and a half from Plaintiff's farm. Plaintiff and Defendant became very good friends [2] and sometimes attended the same church. Defendant sometimes borrowed Plaintiff's farm equipment.

Defendant was a high school graduate who attended John Marshall Law School for three semesters. Defendant was a licensed real estate agent from February of 1971 until the mid–1980s.

Defendant approached Plaintiff on a number of occasions about buying part of Plaintiff's farm. Plaintiff initially declined to sell. Plaintiff later agreed to sell because of debts incurred in his farming operations.

Defendant intended to develop a residential subdivision that would be called Pine Grove. This would be the first subdivision in that part of Newton County, which was a farming community.

Plaintiff and Defendant signed a sales contract dated July 27, 1971. Defendant testified that he prepared the contract. Defendant testified that an attorney named Jerry Capes assisted with the legal description of the tract. The contract states that the tract contained 220 acres. The purchase price of $143,000 was based on a price of $650 per acre.[3] The contract provides that the purchase price would be paid as follows:

| | | |
|---|---|---|
| 1) | $ 1,000 | Earnest money |
| 2) | $ 39,000 | Due at closing |
| 3) | $103,000 | Defendant to make annual payments to Plaintiff of $10,000 plus 7% simple interest until balance paid in full |

Thus, Defendant was to pay the balance owed of $103,000 by making annual payments to Plaintiff of $10,000. Defendant testified that he was to give Plaintiff a deed to secure debt for the balance owed, $103,000. The contract provides that Plaintiff would release ten acres at closing. The contract further provides that Plaintiff would "release land as resold by [Defendant] for a release sum of $650 per acre. Release money to be held in trust until payment is due each year and is to be applied to payment."

Defendant had the tract surveyed prior to closing. The survey, dated September 29, 1971, showed that the tract contained 196.14 acres.[4]

Defendant testified that Mr. Capes prepared the paperwork for the closing. Defendant testified that the closing may have occurred at Plaintiff's residence. Plaintiff signed a warranty deed dated October 4, 1971, conveying the 196.14 acre tract to Defendant. The warranty deed was filed for record on October 5, 1971. Defendant signed a deed to secure debt in favor of Plaintiff. Defendant testified that the deed to secure debt was prepared by Mr. Capes. The deed to secure debt was not filed for record and has been "lost" for some time.

Plaintiff contends that Defendant was to file for record the deed to secure debt. Defendant denies this contention. Defendant testified, however, that he believed that Plaintiff had a lien on the tract.

Mr. Capes testified that he did not, and was not requested to, handle the closing or

---

**2.** Defendant testified that he and Plaintiff were "very good friends."

**3.** A subsequent survey shows that the tract contained 209.31 acres. The evidence presented does not show that the purchase price was adjusted.

**4.** The survey was revised on January 7, 1972, to show that the tract contained 209.31 acres. The surveys were not tendered into evidence, but are referred to in numerous deeds.

prepare the warranty deed[5] or deed to secure debt. Mr. Capes testified that he did not recognize the names of the witness or notary public on the warranty deed. Mr. Capes testified that he had nothing to do with the "transaction." Mr. Capes testified that he subsequently handled some real estate transactions for Defendant, including transactions involving Pine Grove subdivision.

Plaintiff's daughter, Beverly Ozburn Hocumb, testified that she heard Defendant tell her father that they did not need to get a lawyer involved because they trusted each other.

The Court, having considered the evidence presented and the demeanor of the witnesses, is persuaded that Mr. Capes is a more credible witness than Defendant.

Defendant, some five days after the closing, pledged the tract as security for a loan of $5,041.66 from The Bank of Covington. Defendant signed a deed to secure debt dated October 9, 1971. Defendant did not obtain a release from Plaintiff's deed to secure debt. Plaintiff contends Defendant knew that Plaintiff's deed to secure debt had not been filed for record.

Some two weeks later, Defendant pledged the tract as security for a loan of $20,000 from the First National Bank of Newton County. Defendant signed a deed to secure debt dated October 21, 1971.[6] Defendant did not obtain a release from Plaintiff.

Harold Terrell Ozburn is Plaintiff's son. Mr. Ozburn testified that he and Plaintiff were working in the fields on Plaintiff's farm in January of 1972. Mr. Ozburn testified that Defendant approached and requested that Plaintiff sign a "lot release" so that Defendant could sell the first lot in Pine Grove subdivision. Plaintiff signed the "lot release." Mr. Ozburn signed as the witness. Mr. Ozburn was nineteen years old. The "lot release" (Plaintiff's Exhibit 5) was in fact a warranty deed dated January 7, 1972. The face of the warranty deed states that its purpose was to correct an error in the (legal) description of the original warranty deed dated October 4, 1971. Mr. Ozburn testified that his father just took Defendant's word that Plaintiff was signing a lot release because Defendant was a friend and neighbor.

Defendant, that same day, signed a deed to secure debt dated January 7, 1972, in favor of the First National Bank of Newton County. Defendant pledged the tract as security for a loan of $100,000. The bank gave Defendant a quitclaim deed dated January 7, 1972, releasing lot eight. Defendant signed a warranty deed dated January 7, 1972, conveying lot eight to Ricky J. Hackett. Defendant did not obtain a release from Plaintiff.

Pine Grove was subdivided into thirty-eight lots.[7] Defendant sold eighteen lots. Each lot contained some 5.0 to 5.6 acres.[8] Some lots were sold as undeveloped lots. Defendant built houses on other lots. Defendant signed eighteen warranty deeds between January 7, 1972, and September 10, 1973.[9] Defendant testified that he obtained at least two releases from Plaintiff.

---

5. Mr. Capes testified that he may have provided the legal description for the warranty deed.

6. Defendant's deed to secure debt in favor of the Bank of Covington was canceled on October 25, 1971.

7. Lot 38 is the highest numbered lot on the deeds tendered into evidence.

8. The acreage is not shown on four warranty deeds.

9. Defendant also signed a warranty deed dated July 3, 1973, transferring ten lots to Frank E. Moore Construction Company.

The records of the Newton County Superior Court Clerk show that no releases were filed for record.

Defendant signed twenty-nine deeds to secure debt between October 9, 1971, and July 3, 1973, pledging the tract or various lots as security for loans.[10] The lenders were five banks, a land company, and an individual. Defendant obtained thirty-one quitclaim deeds from the lenders, releasing various lots.

Defendant testified that he understood the significance of a warranty deed and a deed to secure debt. The Court is persuaded that Defendant failed to explain why he did not obtain releases from Plaintiff. The Court can only conclude that Defendant knew that Plaintiff's deed to secure debt had not been filed for record.

Defendant testified that he made payments totaling $76,500 to Plaintiff. Defendant testified that he paid $39,000 at closing, $10,000 in 1972, $17,500 in 1973, and $10,000 in 1974.

Defendant suffered financial problems. Defendant had sold eighteen lots in Pine Grove subdivision. Two banks foreclosed on the remaining twenty lots in February of 1974.

Plaintiff filed a complaint in state court against Defendant. Plaintiff obtained a default judgment in January of 1977 in the principal amount of $95,908.80, plus interest and attorney's fees totaling $32,251.08.[11] Defendant testified that he did not have funds to hire an attorney.

Defendant testified that he owed Plaintiff the amount of the default judgment.

Defendant filed a petition under Chapter 7 of the Bankruptcy Code on July 31, 2000. Plaintiff died eighteen weeks prior to the trial of this adversary proceeding.

## CONCLUSIONS OF LAW

Plaintiff contends that Defendant persuaded Plaintiff to sell part of his farm by making a false representation that Defendant would sign and record a deed to secure debt in favor of Plaintiff. Plaintiff contends that he sustained a loss because Defendant failed to record the deed to secure debt.[12] Defendant denies that he agreed to record the deed to secure debt.

Plaintiff contends that Defendant's obligations under the state court's default judgment are nondischargeable under section 523(a)(2)(A), (4), and (6) of the Bankruptcy Code.[13] This section provides as follows:

§ 523.  **Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a

---

**10.** Defendant signed three deeds to secure debt as president of Frank E. Moore Construction Company.

**11.** *See Cohen v. de la Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (discharge exception for fraud includes all liability arising from the debtor's fraud, including an award of attorney's fees and other relief that may exceed the value obtained by the debtor).

**12.** Plaintiff's recorded lien would have had priority over subsequent liens, including the liens of the banks that foreclosed on part of the tract.

**13.** 11 U.S.C.A. § 523(a)(2)(A), (4), (6) (West 1993 & Supp.2001).

statement respecting the debtor's or an insider's financial condition;

. . . .

. . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

. . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C.A. § 523(a)(2)(A)(4), (6) (West 1993 & Supp.2001).

Plaintiff has the burden of proving all facts essential to support his objection to dischargeability by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

"The validity of a creditor's claim [against a bankrupt debtor] is determined by rules of state law. Since 1970, however, the issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code." *Grogan v. Garner,* 111 S.Ct. at 657–58.

Exceptions to dischargeability are to be construed strictly. *Schweig v. Hunter (In re Hunter),* 780 F.2d 1577, 1579 (11th Cir.1986). "The exceptions to discharge were not intended and must not be allowed to swallow the general rule favoring discharge." *Murphy & Robinson Investment Co. v. Cross (In re Cross),* 666 F.2d 873, 880 (5th Cir. Unit B 1982).

"For purposes of § 523(a)(2)(A) [of the Bankruptcy Code], a creditor must prove that (1) the debtor made a false representation with intent to deceive the creditor, (2) the creditor relied on the representation, (3) that his reliance was [justifiable], and (4) that the creditor sustained loss as a result of the representation." *St.*

Laurent v. Ambrose (In re St. Laurent), 991 F.2d 672, 676 (11th Cir.1993); see *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (justifiable reliance required under section 523(a)(2)(A)).

"In order to preclude the discharge of a particular debt because of a debtor's false representation, . . . [t]he debtor must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality." *In re Hunter,* 780 F.2d at 1579.

In *Sears Roebuck & Co. v. Faulk (In re Faulk),*[14] the bankruptcy court stated:

"Actual" fraud precluding discharge consists of any deceit, artifice, trick or design, involving the direct and active operations of the mind used to circumvent or cheat another; something said, done or omitted with the design of perpetrating what is known to be a cheat or deception. However, fraud may consist of silence, concealment or intentional non-disclosure of a material fact, as well as affirmative misrepresentation of a material fact.

A "false pretense" involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a "false representation" which is an express misrepresentation.

69 B.R. at 750.

*See also* 4 *Collier on Bankruptcy* ¶ 523.08[1][d], [e] (15th ed. rev.2002).

"Because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of a case." *Devers v. Bank of Sheridan,*

14. 69 B.R. 743 (Bankr.N.D.Ind.1986).

*Montana (In re Devers)*, 759 F.2d 751, 754 (9th Cir.1985).

■ "[J]ustifiable reliance requires the creditor to act appropriately according to his individual circumstances." *City Bank & Trust Co. v. Vann (In re Vann)*, 67 F.3d 277, 284 (11th Cir.1995).

■ "The [justifiable reliance] inquiry will thus focus on whether the falsity of the representation was or should have been readily apparent to the individual to whom it was made. This is a less exacting standard than 'reasonable' reliance, which would focus on whether reliance would have been reasonable to the hypothetical average person." 4 *Collier on Bankruptcy* ¶ 523.08[1][d] p. 523–44 (15th ed. rev.2002).

■ "A party may justifiably rely on a misrepresentation even when he could have ascertained its falsity by conducting an investigation." *See* Restatement (Second) of Torts §§ 540, 541 cmt. a (1976); *Prosser* § 108, at 753; *see also Field*, 516 U.S. at 70, 116 S.Ct. 437, 133 L.Ed.2d 351. This rule applies whether the investigation would have been costly and required extensive effort or could have been made without "any considerable trouble or expense." Restatement § 540 cmt. a; *Prosser* § 108, at 753. *Sanford Institution for Savings v. Gallo*, 156 F.3d 71, 74–75 (1st Cir.1998).

■ "Although one cannot close his eyes and blindly rely, mere negligence in failing to discover an intentional misrepresentation is no defense to fraud." *Apte v. Japra (In re Apte)*, 96 F.3d 1319, 1322 (9th Cir.1996).

In *Field v. Mans*,[15] the United States Supreme Court held that section 523(a)(2)(A) requires justifiable reliance. The Supreme Court stated, in part, as follows:

The Restatement [(Second) of Torts (1976)] expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." *Id.*, § 540. Significantly for our purposes, the illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have "walk[ed] across the street to the office of the register of deeds in the courthouse" and easily have learned of an unsatisfied mortgage. *Id.*, § 540, Illustration 1. The point is otherwise made in a later section noting that contributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort. Here a contrast between a justifiable and reasonable reliance is clear: "Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.*, § 545A, Comment b.

116 S.Ct. at 444.

The Supreme Court also stated:

It makes sense to protect a creditor even if he was not quite reasonable in relying on a fraudulent representation; fraudulence weakens the debtor's claim to consideration.

116 S.Ct. at 446.

■ Turning to the case at bar, Plaintiff contends that Defendant made a false

---

**15.** 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

representation that he would record the deed to secure debt in favor of Plaintiff.

The Court, from the evidence presented, is persuaded that Defendant handled the closing in which he purchased part of Plaintiff's farm. The closing probably occurred at Plaintiff's residence. Plaintiff was a farmer with an eighth grade education who trusted his friend and neighbor. Defendant was a licensed real estate agent who had attended law school. Defendant's warranty deed was promptly recorded. Defendant, some five days after the closing, pledged the tract as security for a loan without obtaining a release from Plaintiff. Defendant sold eighteen lots in Pine Grove subdivision during the next two years. Defendant signed twenty-nine deeds to secure debt in favor of several lenders. No releases from Plaintiff were filed for record.[16] The Court can only conclude that Defendant knew that his deed to secure debt to Plaintiff had not been recorded. The Court, having considered the evidence presented and the demeanor of the witnesses, is persuaded that Defendant made a false representation that he would record Plaintiff's deed to secure debt. The Court is persuaded that Defendant intentionally failed to record the deed to secure debt.

Defendant notes that he made substantial payments totaling $76,500 to Plaintiff. Defendant contends these payments demonstrate that he did not intend to defraud Plaintiff. The Court is not persuaded. The fact that Defendant made payments on the obligations he owed to Plaintiff does not excuse Defendant's fraud. Defendant failed to record the deed to secure debt. The Court notes that Defendant did record the warranty deed executed by Plaintiff.

The Court is persuaded that Plaintiff's reliance was justified that Defendant would record the deed to secure debt. Plaintiff and Defendant were friends and neighbors. They sometimes attended the same church. Defendant sometimes borrowed Plaintiff's farm equipment. Defendant was a licensed real estate agent who had attended law school. Plaintiff was a farmer with an eighth grade education. Plaintiff did business "on a handshake." Simply stated, Defendant was more "sophisticated" than Plaintiff.

Plaintiff suffered a loss because his deed to secure debt was not recorded. Plaintiff's recorded lien would have had priority over subsequent liens, including the liens of the banks that foreclosed. The Court is persuaded that Defendant's obligations are nondischargeable under section 523(a)(2)(A).

■ The Court now turns to consider section 523(a)(4). *Collier on Bankruptcy* states, in part:

¶ **523.10. Discharge Exception for Fiduciary Debts, Embezzlement or Larceny; § 523(a)(4).**

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

**[1]—Debts for Fiduciary Fraud or Defalcation.**

Debts for fraud or defalcation while acting in a fiduciary capacity are excepted from discharge. This exception from discharge must be distinguished from that of debts for obtaining money, property, services or credit by false pretenses or representations.

---

**16.** The Court notes that whether Plaintiff should have recognized that Defendant was selling lots without obtaining releases is irrelevant. Defendant's fraud in failing to record the deed to secure debt had already been committed. *Collins v. Palm Beach Savings & Loan (In re Collins)*, 946 F.2d 815 (11th Cir. 1991) (creditor's subsequent failure to prevent its own injury irrelevant).

**[a]—"Fraud" for Purposes of the Fiduciary Debt Exception.**

"Fraud" for purposes of this exception has generally been interpreted as involving intentional deceit, rather than implied or constructive fraud.

**[b]—"Defalcation" for Purposes of the Fiduciary Debt Exception; Burden of Proof.**

Defalcation refers to a failure to produce funds entrusted to a fiduciary and applies to conduct that does not necessarily reach the level of fraud, embezzlement or misappropriation. Since debts arising from breaches of ordinary care are normally dischargeable in bankruptcy, and exceptions to discharge are strictly construed in favor of the debtor, some degree of culpability is required to make a debt nondischargeable as a defalcation under section 523(a)(4). However, when a debtor has been acting as a trustee or other fiduciary, the debtor is responsible for knowledge of the fiduciary responsibilities and may not cite mere ignorance as a defense to an objection to dischargeability asserted under section 523(a)(4).

. . . .

**[c]—The Meaning of "While Acting in a Fiduciary Capacity"; § 523(a)(11); § 523(e).**

The language of section 523(a)(4) relates to "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." The phrase "while acting in a fiduciary capacity" clearly qualifies the words "fraud or defalcation" and not "embezzlement" or "larceny"; the implication is that the discharge exception applies even when the embezzlement or larceny was committed by someone not acting as a fiduciary.

The qualification that the debtor be acting in a fiduciary capacity has consistently, since its appearance in the Act of 1841, been limited in its application to what may be described as technical or express trusts, and not to trusts *ex maleficio* that may be imposed because of the very act of wrongdoing out of which the contested debt arose. The trust relationship must predate and exist apart from the act from which the underlying indebtedness arose.

For purposes of section 523(a)(4), the definition of "fiduciary" is narrowly construed, meaning that the applicable state law that creates a fiduciary relationship must clearly outline the fiduciary duties and identify the trust property; if state law does not clearly and expressly impose trust-like obligations on a party, the court will not assume that such duties exist and will not find that there was a fiduciary relationship.

4 *Collier on Bankruptcy,* ¶ 523.10 (15th ed. rev.2002).

The Court is not persuaded that Defendant committed fraud or defalcation while acting in a fiduciary capacity. Plaintiff has not shown by a preponderance of the evidence that Defendant was a fiduciary as that term is used in section 523(a)(4). There is no evidence that Defendant committed embezzlement or larceny. *See Nodvin v. Beckman (In re Beckman),* Ch. 7 Case No. 96–55200, Adv. No. 97–5022 (Bankr.M.D. Ga. April 1, 1998), *aff'd,* C.A. No. 5:98–CV–162–4 (HL) (M.D.Ga. March 31, 1999) (Embezzlement is the fraudulent appropriation of entrusted property; larceny is the fraudulent and wrongful taking of property of another).

The Court now turns to section 523(a)(6), which provides that a debtor may not discharge any debt for willful and malicious injury to another entity or to the property of another entity.

"The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or in-

tentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998).

■ "Willful means intentional or deliberate and can not be established merely by applying a recklessness standard." *Lee v. Ikner (In re Ikner)*, 883 F.2d 986, 989 (11th Cir.1989).

■ Malicious means wrongful and without just cause or excessive even in the absence of personal hatred, spite, or ill will. Malice can be established by a finding of implied or constructive malice. Special malice, a specific intent to harm another, need not be proven. Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice. *In re Ikner*, 883 F.2d at 991.

■ An act of reckless disregard of the rights of others is insufficient to constitute willful and malicious conduct. *American Cast Iron Pipe Co. v. Wrenn (In re Wrenn)*, 791 F.2d 1542, 1544 (11th Cir. 1986).

■ The evidence shows that Defendant made a false representation that he would record the deed to secure debt. Plaintiff suffered a loss because his deed to secure debt was not recorded. The Court is not persuaded, however, that Defendant intended to cause a willful and malicious injury as that term is used in section 523(a)(6). Defendant did not record the deed to secure debt, which in turn caused injury to Plaintiff. While the Court is persuaded that Defendant acted fraudulently, the evidence does not persuade the Court that Defendant acted willfully and maliciously.

An order in accordance with this memorandum opinion will be entered this date.